This is the first day of a three-day sitting, and I'm going to guess you all know the lighting rules. So, the first case is 24-60222, ANR Pipeline v. Federal Energy Regulatory Commission, and we'll hear from you, Mr. Murata. Thank you, Your Honor, and may it please the Court, Sean Murata on behalf of the petitioner ANR Pipeline. Like all gases, natural gas moves from flowing from areas of high pressure to areas of low pressure. That means natural gas pipeline needs a consistent flow of gas into and out of the pipeline. As a matter of physics, a pipeline can't work if all shippers are taking gas with no one delivering to replace it, and that principle is critically important during winter storms when gas supply is at its low and gas demand is at its peak. ANR's short-notice service allows power plants to start up on two hours' notice and to take natural gas from ANR's pipeline at variable or non-rateable speeds, but by requiring a nomination in compliance with Section 6.6 of ANR's tariff, short-notice service builds in the principle that gas cannot be taken without being replaced. It does so by providing in Section 5.5.4 that after requesting short-notice startup, the shipper, quote, shall provide a nomination consistent with Section 6.6, and a nomination is not consistent with Section 6.6 unless it complies with Section 6.6.3's requirement that a shipper cannot begin... 5.5.4, and I'll abbreviate it that way, just because it's easier to say it, that would be ambiguous as to delivery if it were without any cross-reference. Fair to say? If there wasn't a cross-reference to 6.6, it would be hard to... So the focus really, tell me if I'm wrong, the focus is just the shall also clause. I think that's right, and I think that is in many ways the hook for our textual argument, and I think it's where a lot of the arguments from my friends on the other side don't take it fully into account. Is there any relevance to the fact that that's the third paragraph, but in the first clause of 5.5.4, there is another cross-reference to 6.6, but it says cross-reference in addition to 6.6, nominations, and scheduling, whereas then you get down to the third paragraph and it just says 6.6 as to nominations. So is the scheduling surplusage, or... This is a question I guess I'll turn into a question. Where do I find the best nomination of the definition? How comprehensive is the word nomination? So nomination is not a defined term under the tariff. There is a list of defined terms at the start of the general terms and conditions. Nomination is not one of them. Section 6.6 as a whole is entitled nominations. I take it there are things, and I think as with many words, nominations can be used in a broad sense or a general... Could it just mean amount elected?  So a nomination can be thought of as a request to move from point A to point B. You go to the computer system, you plug in and say, I want it to go from this receipt point to this delivery point. That's a nomination. But you see where I'm going with whether... Is there ambiguity? Because specifically for these short notice people, all they have to do is being consistent with this nominating portions of 6.6, but 6.6.3 looks to me like it's a scheduling portion. This isn't what FERC is arguing, but the interveners suggest maybe there's some ambiguity in terms of scheduling, receipt, delivery. Those aren't contemplated. I think it's that nomination, because it's not a defined term, it's used in both the broader sense and the narrow sense. When it says a nomination consistent with 6.6 and not any of the numbers that come after that, it means the entire section. But 6.2 about intra-day deliveries, that wouldn't apply to a short notice recipient, would it? 6.6.2? Well, it's in addition to those existing procedures, so if you want to use the 6.6 intra-day cycle, you can. You can have your gas delivered on that cycle if you like. Right, but if you want it on the two hours, then that would be inapplicable. Well, I think it's in addition to, not inapplicable. I mean, I take it in the sense that you're not following 6.6.2, but I think this gets the dispute you say in the brief about the definition of the word, in addition to. It's a set of optional proceedings that go on top of the existing procedures you have if you're a firm shipper on A&R's pipeline. Oh, but you can't pick and choose 6.6.2, well, that's optional, but 6.6.3, that's clearly incorporated. Well, but it's not optional. I mean, it's optional in the sense that, of course, if you don't want to nominate on that cycle, yes, you have purchased this additional service. Everyone agrees that's what you're purchasing when you elect short-notice shipping. But it's not as if that section doesn't apply. If you want to nominate on a 6.6.1 cycle, you can. And they are fully entitled to do that. It's just they've purchased an additional enhancement to it that says if you want to nominate not on those cycles at all, do it within two hours, purchase this service. But none of it takes away from the broader overarching principle that I talked about at the beginning, which is you've got to give us gas to replace the gas you're taking because our pipeline can't work otherwise. But, go ahead. Well, but it wasn't necessary to have the simultaneous delivery before the storm, before Storm Elliot. It's not as if Elliot was the first storm in history. It wasn't the first storm in history, though certainly the FERC report that's cited in our brief is it's an unusual event and was quite severe. So it was, in fact, the first time that we had to so strictly enforce the tariff. But it is what the tariff requires. And I think something that sort of flows through our brief— If that's what the tariff requires, let me ask, was this requirement ever enforced or acknowledged prior to the storm? We don't have anything in this record, Your Honor. I do know outside the record we've apparently issued other similar critical notice warnings. But I will say inside this record, there is only the critical notice warning that has been—that was issued in advance of Winter Storm Elliot. What I see in the record—sorry, last point—is what I see in the record is that ANR never required short-notice service shippers to nominate and supply gas prior to startup. This is at record 17.14. I agree within this record, Judge Ho. The only critical notice that we have and the only instance of it that anybody pointed to is the one before Winter Storm Elliot. I'd point— You mean ANR was violating its own tariff before that? No, it's that ANR was providing operational flexibility to its shippers, as it commonly does because it's in the customer service business, Judge Wilson. For instance, one example that's in the record is you might notice that during Winter to ANR. And then ANR shut them down after 10 minutes. One of the discussions in the pleading at FERC is, is why did Ellis Power try to start up on no notice? And the answer that ANR gave in its pleadings was, well, that's the way we always used to do it, so that's the way we did it that time. Everyone agrees that 554 requires two-hour notice. It's just that as a matter of operational flexibility in the past, we've allowed them to start on no notice. So I think it goes to show that there is a sign of operational flexibility that has carried out throughout this relationship. It's just that when the chips are down during a winter storm, you're going to be held strictly to the terms of the tariff, even if we have not required that level of strict enforcement previously. As to your system integrity concerns, if the chips really get down, you still do have force majeure as to a weather event, or force majeure cannot count, isn't triggered by weather? So it can be triggered by a weather event, Judge Higginson, but the commission's strong policy is that you should do everything you can before you pull that particular lever. So if you think of it as sort of a, it's not exactly a hierarchy because they apply to slightly different ways, but I think the way to sort of informally think of it is, we start by saying, you know what, everybody, no more operational flexibility. The terms of the tariff are the terms of the tariff, you get exactly what you contracted for. I'm going to interrupt you there, although I like, I'm very, putting it out that way is helpful. So if you can remember to come back to the levers. But let's assume your strict enforcement interpretation is correct. I'm still a little confused as to what simultaneous means. So if you're right, because in the brief you keep saying they just have to begin some level. Does that even mean they could just put a drop or two in and then the rest at the end? So my understanding is they have to provide what's called rateable flow, which is to say you provide gas on a same amount every hour. But of course you're taking from at a non-rateable or variable flow. So in some sense you are taking faster than you're giving. That's the so-called working gas that's discussed in the papers, which is because you are taking faster than you're giving, there has to be some storage and line pack that is supporting that. I understand that. That does mean, though, there's a little ambiguity even in your interpretive, it doesn't mean simultaneous receipt. It's actually a bit of a loan. It's just a loan for an hour as opposed to a day, or would you push back on that? I would push back on it only because loan in the industry has a defined meaning. We offer an interruptible, what's called park and service. But in your brief you kept saying we're not in the business of loaning gas, which you are loaning a little bit, even under your interpretation. In the sense that there is a bit of, we are supporting it with our line pack and storage, I don't think that's considered a loan in the industry. It's called flex gas or working gas. But it's less than simultaneous. Yes. I do think that the word simultaneous is essentially in the sense of corresponding. There has to be a corresponding delivery of gas. Hour by hour instead of by day. Correct. There has to be gas, there has to be, we have to be able to show that we can support our pipeline. And I want to get back to the tiers, Judge Higginson. The first one is we strictly enforce it. The second one is operational flow order, which says that, you know what, we need to keep a very tight tolerance of inflows and outflows, because we are under dire circumstances. And we often do that preemptively, saying like, okay, we're not quite in crisis yet, but we're going to apply this operational flow order to make sure that we can keep the pipeline running. And that's what we ultimately had to do on December 24th, when even our attempts to strictly enforce the tariff failed. And then force majeure is even more dramatic than that, where we say, you know what, even though the contract provides XYZ, we can't do that anymore because of an act of God. So the commission's strong preference is that we don't turn to even an operational flow order, that we have the maximum amount of operational flexibility to keep the pipeline running. Now, I do take the response on the other side that if that's what we agreed to, that's what we agreed to, sure. But the question, once you're in the world of ambiguity, is what did we agree to? And one of the things you should think about when resolving that ambiguity is this long stated preference towards avoiding operational flow orders. So that's our argument on that particular point. That's the counter. Even if ambiguity. One of the things they had to take into account, and if we are in a world of ambiguity, so in other words, if you have disagreed with me that this is an unambiguous tariff, we're now more into a traditional Administrative Procedure Act world, where you say, okay FERC, you have some ambiguous stuff in front of you, you have to reasonably and logically explain what is going on and how you are resolving the ambiguity. And I think the flaw in the agency's argument here was, that sometimes happens in agency's decisions is, they pretend that all the evidence goes in one direction. They don't say, you know, there's some good arguments on this side, there's some good arguments on that side, we're going to weigh them and consider them and here's our result. But, I mean, they do exactly that throughout their order. I mean, they're grappling with... Well, what they do is they summarize everybody's views. I mean, this is... I disagree with yours. And they disagree with ours, but... But there are reasons for why they disagree. But... For example, in sex, in interplaying 5.5.4 and 6.6, they say, well, your argument doesn't carry water because there are other inconsistencies between 5.5.4 and what's contained in all the provisions of 6.6, and, I mean, they sort of square that. Isn't that all that they're required to do in terms of our review? I think they are required to give the... Acknowledge the argument, explain why they disagree and have a rational basis. I think where they really fall down is when they start discussing the statements and various answers and testimonies. The support versus provide versus necessary. With respect to the inconsistencies they point out, I think that's more on the side of the ledger when we're talking about just the text of the tariff and I just don't think there's any ambiguity. I think what they are trying to do is engage in a sort of strict constructionism of the tariff where they take individual snippets and say, if we push hard enough on this text, I can come up with ways in which I can't always work it out. But, one, just because a tariff could be hypothetically even clearer than it is doesn't mean it's unambiguous under Texas law and the circuit's law. And second, you should give a tariff, like any contract, a harmonious reading. To read it as a whole and to read it in light of the commercial background. Commercial background, among other things, being the requirement that there be adequate pressure in the pipeline and also the menu of services that we as a pipeline are providing. One of the things we haven't talked about so far today is the interaction with the no-notice service, where we in fact require people who are taking on a no-notice basis to have gas in storage that we can pull from to provide that consistent pipeline pressure. But yet the LS powers of the world who have a less expensive product essentially have even a greater right to draw on our own storage and line pack to support their service, which just doesn't make commercial sense and suggests why the Commission's way of approaching the tax doesn't make sense. I think that's all I have, so unless the Court has further questions. Great. You reserve your time. Great. Thank you very much. And I think we're hearing from FERC first. Is it Mr. Ettinger? Ettinger. Thank you, Your Honor. May it please the Court. My name is Scott Ettinger, and I'm appearing for the Federal Energy Regulatory Commission. Thank you for hearing this case this afternoon. This case is about a meaningful interpretation of A&R's tariff-defined service. The tariff language permits shippers to take short-notice service 5.5.4 within short notice upon a phone call and service within two hours. This case requires a reconciliation between 5.5.4 and the very specific 5.5.4 and the very general 6.6.3, which is embedded in Part 6 of A&R's tariffs, which is a— I mean, in a broad sense, what they're saying is consistent with can't mean exempt from. That's a little—it's a persuasive point. Twice in 5.5.4, it does approvingly refer to 6.6, saying at least consistent with. But isn't your argument saying exempted from? Our argument is that 5.5.4 refers to nomination pursuant to 6.6. It doesn't say all subsections of 6.6. But his point is 6.6 generally is called nomination. That's true, Your Honor. Do you have authority that says nomination only means electing an amount? It doesn't relate to supply, delivery, provide? What's the authority? The authority—Your Honor, I would point Your Honor to the language of 6.6.3 itself, which refers to both nomination and delivery. And I would submit that because it refers to both nomination and delivery, nomination can't be subsumed within—delivery can't be subsumed within the definition of the meaning of nomination. So part of 6.6.3 is incorporated, but not the delivery portions? I thought you said you were exempt from 6.6.3 altogether. I think that's correct. But if it says consistent with the nomination, and you're zeroing in on the fact 6.6.3 has nomination in it— Well, 5.5.4 has a nomination. It says there has to be a nomination, and we can talk about those intra—in fact, the commission did that in footnote 75 of the declaratory order, and there is the intraday to nomination schedule, and that, to be sure, is required, but it's required by 5.5.4. So I guess let me step back then. Do you have any authority, FERC commission ruling authority, that tells me what the word nominate comprehends? Or specifically that doesn't comprehend delivery? I don't. I can point, Your Honors, to the first line of—so again, the footnote that I was just referring to is footnote 75, the declaratory order 47, and that talks about—that runs through how the commission's interpretation here is consistent with the tariff, and it talks there about making the telephone call at 10 o'clock— The notification. Notification. Then the verification. And then the— Then you nominate. And that happens at nomination at 2.30, and that's a request, and that's the first line of each subsection of 6.6.1 is that nomination, which would be a request. Is there any subsection that is utterly incompatible, which would then support what I thought was your primary argument for ambiguity, which is a broad reference to a general provision when we know some subsections don't apply, can't supersede the more specific? So what is the subsection that absolutely can't apply to short notice folks? Well, this section can't apply. This is the only one that doesn't apply. Is that what your point is? That seems like a strained ruling. It's only—this is an ambiguous cross-reference because the one you don't like, 6.6.3? It's not that we don't like it. It's just that there—and the commission talked about this, and we hear in order paragraph 25. I'm just interrupting because I thought your argument, but I may be wrong, was that other subsections clearly can't apply to short notice holders. No? All the rest apply? I think what the commission is saying in paragraph 25 is that there are other services that can't—that clearly don't apply, don't have to comply with 6.6.3. But a short notice holder has to comply with every one except the one that they favor. As far as I know, I'm not thinking of any exceptions. Okay. Now, that's an honest answer. That makes it a little more difficult for me. And the commission talks about three examples of what I just stated, and one of them—and this is a paragraph 25 that we hear in order—the first one is that the short notice shipper doesn't—or the FTS-3 shipper doesn't strictly comply with the schedules in 6.6.1. And there's a—and those timelines which are set forth in the declaratory order at paragraph 51, note 79. Those are much longer timeframes. And— But let me just be clear. A short notice service shipper does or doesn't have to nominate at all? It does have to nominate. Okay. So when the commission wrote, short notice shipper is not obligated to provide a nomination prior to the startup of gas flows— That is true. That is right. It has to nominate later. Oh, you can do it after you start to take the gas? Correct. In two hours. That's the purpose of this service. No, the nomination, not the delivery back. They can nominate after they start taking? Correct. Yes, Your Honor. Okay. That's right. And that's the only way this can work is for the service to begin within two hours. That's the point of this service. And then we know from 5.5.4 that the nomination comes later. I mean, the nomination doesn't start the meter running in terms of the two hours. It's the phone call saying we need to start taking. That's right. That's right. And then the nomination, we know from 5.5.4, comes later according to the time frame set forth in— And tell me again what you mean by nomination? That's the— Return of? That's the whatever's contemplated 6.6.1. What is it? What's happening? It's a request. And it's a— So you notify and notification is different than request? Notification here is under 5.5.4. I would just say that's different. So is the notice—is the nomination where the customer, I guess, shipper, actually says this is how much we intend to draw down per the notice we gave two plus hours ago? Or you get what I'm saying? In other words, is that where they specify the quantity they're taking also? I think that's where they would specify what's contemplated here. I think that's what they would specify their arrangement for coming into balance by the end of the day.  The delivery of supply, which is an important point. It's something that— I feel confused, but I'm sure it's because I don't know the industry and both of you know it so well. But you're saying you notify them saying I will need gas. And then later you're going to nominate and say what we all know to be true, which is I'll give it back to you at the end of the day. That's correct. That's what nomination is? You're going to get it when we've always given it to you at the end of the day? I think that's what's contemplated here. I think that's what's contemplated here for the shipper to come into balance by the end of the day. And nothing the commission has done here affects that. When do they specify how much they're taking? The notice or the nomination? The notice. The notice. All the nomination is doing is we're going to give it to you and we always give it to you? I think that's where the arrangement is made to return to balance by the end of the day. I think that's correct. But why would they need to do that if that was what was required? That's what's required by 5.5.4, the nomination. Those arrangements are made at that time. But wouldn't they do that, take out 5.5.4, just the normal case under the, I can't remember, the FTP3 or whatever the tariff is, wouldn't they also give a nomination before they start drawing down that would include like how much they're going to take and how much they're going to replace by the end of the gas day? I'm not sure I follow the question. I've got the schedule in front of me. Outside the context of short notice service, they would make a nomination. For example, the example that the commission used, they'd make a nomination at 2.30 for gas that would start to flow at 6 o'clock. And I think the amounts would be specified at that time. Let's say you're not a short notice shipper, then 6.6.3 does apply? Yes. Okay. And then you have to sign, the transporter has to simultaneously receive it as it's drawn out? That's what 6.6.3 requires. Simultaneous receipt. That's right. It talks about... Do you agree with opposing counsel that actually that doesn't mean simultaneous, it means within an hour? I'm not sure I agree with that. But I think simultaneous, and we know that this is one thing that the commission relies on and talks about, is that the non-rateable FTS3 is a service that you can get your entire entitlement within four hours, yet spread the delivery over 24. So that is not simultaneous. So that wouldn't be consistent with 6.6. Part of your argument, there's ambiguity even accepting the argument that 6.6.3 all by itself has built in ambiguity, because no one ever means simultaneous. Well I think for the FTS3, that's true, and it's definitely true for the short notice service here. And all the commission is doing by pointing this out is that there are other instances that don't have to strictly comply with 6.6.3, and one of those instances is a non-rateable flow according to FTS3 service. Another example of that is the no-notice service, which isn't required to comply with 6.6.3. I mean basically you answered my confusing question, at least to the extent that that's what I was getting at, is I'm trying to figure out in my mind what's the difference between what I would say the baseline, which is FTS3, right, and then there's the two-hour notice, and then there's the no notice. And different shippers are paying different fares, so to speak, for each of those types of accessibility, I guess, right? That's right. And in the context of that, I guess my question was more, so what is the difference between in the two-hour notice, the nomination that's required and the delivery that's required versus the FTS3, the normal case? The normal case would have to comply with the regular schedules at 6.6.1. What you're getting for the two-hour notice is basically the ability to draw down more quickly. That's right. Two hours. And then the real ambiguity is what simultaneous means, right? Right, and it can't mean here it would be impractical to ask for the shippers to arrange for supply within that time frame. Well, that's indeed what the no-notice shippers do. They have to basically bank their supply by paying for storage and putting it in storage. Whereas here, it's simultaneous, right? It's effectively simultaneous at the time they draw down with no notice because they've already met the delivery. I'm not sure I can agree with that entirely. I think it's ahead of time. They're not providing the supply to the pipeline simultaneously. It's something that they've done ahead of time, and I think what the commission was right to point that out as an example where 6.6.3 doesn't apply to them. And if I may, I would like to get into one of the arguments that the pipeline makes here is that there's some, in terms of the menu of services, there's some inconsistency here in that no-notice service is priced up here, and short-notice service is priced down here, and the commission is given some sort of interpretation that makes it actually more attractive than no notice. And that has some visceral appeal, superficial appeal, but I think that it falls apart when we examine the details. And first of all, to point out the very obvious is that no-notice service is much better than two-hour service, and that's so to answer the rhetorical question that ANR poses, why would a short-notice shipper pay more for no-notice service? That's one reason. The second reason, and perhaps more compelling, is the idea that the short-notice shipper must come into compliance with its daily balance at the end of the day. And that is something that the no-notice shipper doesn't have to comply with because it already has the storage banked out. Before your time ends, just list what you think, because we asked a lot of questions. Some of them were my confusion. Sources of ambiguity for the shall also clause are what? Take them off bullet point. Yeah, the ambiguity comes, and also one thing I didn't mention is that 6.6.3 itself says that it's subject to other provisions of the tariff. So let's keep that in mind. And just focus on the shall also, 5.5.4, which you say stands alone, at least as to delivery. It's ambiguous because? It's ambiguous because it doesn't have the timing requirement that pipeline demands here. It refers to a nomination of 6.6, not a nomination and delivery. That's something different. And the commission pointed out in paragraph 25 of the rehearing order that there are at least three examples of other services that aren't required to comply with 6.6.3. Can we consider system integrity when we do contract interpretation or not? I think it's something that the commission pays very close attention to, but what the commission found here is that this is a responsibility of ANR. And they have a responsibility not to contract beyond what their system is capable of doing. And the commission made that finding in rehearing order paragraph 42. So this is a responsibility of the pipeline not to contract beyond its capabilities. Under time. Okay. Thank you, your honor. And we'll hear from Mr. Dre. Is that correct? Good afternoon, I'm Dominic Dre for the intervener LS Power. FERC got this one exactly right, but they're actually a little too generous to ANR in suggesting that there's ambiguity in this tariff. 5.5.4 unambiguously sold LS Power the right to draw gas on two hours notice. The tariff requires LS to true up that gas by the end of the gas day. That's 6.1 paragraph 77. And the way in which it trues it up is through a quote nomination consistent with 6.6. The rules for nomination are in 661 and 662. ANR then points to a different provision 663 that doesn't have to do with nomination at all. Or it doesn't have to do with nomination outside the context of an FTS1 shipper. Can you help me with a source outside of this case for the definition of nomination? So, I can't give you anything. And actually my answer to that question, which I was interested to hear the court ask the commission, is that this is addressed in paragraph 52, it's at R12.19 of their order. Where they draw the distinction between nomination on the one hand and delivery of gas on the other. First of all, 663 itself draws that distinction, but setting that aside, you're asking outside of the tariff. This is one of those areas, which is to say industry usage and what it means to nominate, deliver, provide notice, where the agency's expertise is actually a useful thing in its advantage. Your experience, knowing this industry, nomination does not extend to returning, delivering, supplying. They're different concepts. And you can see it in 663. So 663, and Judge Wilson, you were asking a question along these lines. 663 and the following provision, 664, are addressed to FTS1 shippers. That is the folks who have rateable 24 hours, they're putting gas on and they're taking gas off. 664 then says, if you're FTS3, so bear in mind there are four things really at work here. There's FTS1, those are your basic putting gas on, taking gas off. There's FTS3, which is non-rateable. There's two-hour notice, which is a form of FTS3, but only with two hours notice. And then there's no notice, which is the same thing, but with no notice. All the discussion in 663 is oriented toward FTS1 shippers who have to put on, for them, nomination and delivery are the same thing, because they do it 24 hours a day at a rateable pace. For those of us who pay for the premium, and by the way, the premium, there was some discussion with our friend on the other side earlier, the premium is at its most valuable precisely when conditions are bad. The reason we pay for two-hour notice service is so that when a storm comes, we can start up the service and provide electricity to people in the upper Midwest. That's the whole reason that this is valuable. It doesn't make any economic sense, setting aside any other part of the tariff, it doesn't make any sense to get rid of that. Now, returning to 663, by its own terms, and one of the things the court sort of started asking my friend on the other side about, was by its very terms, 663 is quote-unquote subject to other provisions. It is not intended to override or be a controlling thing in all circumstances. It's also a case of the specific and the general. 554 is specific, 63 is the general FTS1, and then there's the issue about the language. And here I'm going to be sort of very textual for a moment. If you look at 554, it refers twice to nominations consistent with 66. Nomination consistent with 66 is 661 and 662. We agree, we have to act consistently with those subparts of 66. 663 is entitled delivery of gas, and it talks about nomination and delivery. That is one of the things that is, you know, one of the reasons it says subject to other provisions is to carve out 554, which is an additional service. That's what in addition means. It's an additional service for which we pay handsomely. Not as much as the no-notice guys, but 50% of the premium. The initial cross-reference, in addition to. Yes. It does say nominations and scheduling. Nomination and scheduling procedures. Is it significant that it says in addition to and scheduling, whereas it doesn't repeat that? Or is that, am I going down the wrong road on that? I mean, here's how I understand that. Nomination and scheduling refers to the sequence in 661 that sets up those different times of day when you can nominate gas. That is a schedule that it provides. There's more to nomination, so look at 662B, which says, I forget which of your honors asked this question, but 662B says if you nominate intraday, we're going to treat it in the same manner as 661. So that's also related to nomination and also scheduling. So that's the interaction. I don't want to. Yes. What, could you comply with 663? What would you think your obligation to resend gas would be if 663? So no, one of, and FERC points this out in its order. It is impractical, impracticable for short notice shippers to obtain gas. Nobody sells it off cycle. And you need another pipeline to bring it to the delivery point of ANR's pipeline. That's not available off cycle. That's getting into extrinsic evidence, which our position again is that this is unambiguous. If you work through it, and you look at, yes. Thank you. Thank you. Mr. Morata. Thank you, your honors. I'll make four quick points in rebuttal. First, a lot of the discussion that I just heard from LS Power is that nomination means consistent with 661 and 662. But 6.6 has six subsections. If the tariff drafters had meant 661 and 662, they could have just said that. By saying that it's going to be consistent with all of 66, but yet carving out two thirds of it, I think shows the reason that their argument doesn't hang together. Second, the third paragraph in 554 would be largely superfluous under their view. Because as I think my friends have pointed out, there is an overarching requirement that you come into balance by the end of the day under 651 and 6177. So why would we put in the third paragraph if all of that is doing is restating the requirement to come into balance by the end of the day? It has to be doing something different. And that something different is reminding the requirement that you have to be delivering gas at the same time you're taking it. That's consistent with the operational realities of running a pipeline, and it's consistent with the commercial context. And so therefore, it's properly taken into account when you're interpreting the text of the tariff. Finally, third, with respect to the notion of specific and general. The commission's entire finding of ambiguity is premised on the idea that there is nothing in 554 that tells you when you have to come into balance. That they have to look outside of 554 for that. If that's the case, then there can be no application of the specific general canon. Because in their view, there is nothing specific that the specific general canon would apply to, in their view. In addition, to the extent that there is a thought that simultaneous is the word that's ambiguous, that has not been the linchpin of the commission's argument at any point, I think, basically till argument today. It's been about this silence on when you make the delivery. Here's a naive question, but was there argument in front of the commission? No, there was not. It was done on the papers, as it quite frankly, as it generally is.  And then- In the re-hearing, there was a third new member? I believe that's correct. I want to say Commissioner C may have joined at that point, but I don't want to be held to that because I don't have the roster in front of me. But of course, it is a requirement that with natural gas cases, you must both submit and then submit again on re-hearing before seeking judicial review. And then our final overarching point is just this. ANR generally offers transportation service. That is, we take your gas from one point to another point. Now, of course, we don't deliver you the exact same molecules because natural gas is a fungible commodity. But it is consistent with the overall notion of transportation service, of which FTS-3 is a part, that if you are going to be getting gas at your receipt point, at your delivery point, you need to be giving it to us in at the receipt point. Unless you've purchased some other products like storage or otherwise. Unless the court has further questions, we'd ask that you vacate. Thank you both. Thank you. Case is submitted.